MaddeN, Judge,
delivered the opinion of the court:
Section one of the jurisdictional act under which this suit is brought is as follows:
That jurisdiction is hereby conferred upon the Court of Claims to hear, determine, and render judgment upon the claim of the city of Perth Amboy, New Jersey, against the United States upon its merits and according to the equities of the case with a view of reimbursing the claimant for money expended in 1918,1919, and 1920 by the city of Perth Amboy, New Jersey, growing out of an agreement, formal or informal, with the United States to extend the city’s water system for the purpose of supplying water to the Raritan Arsenal and Colonia Base Hospital, Numbered 2, less the present estimated value of the equipment installed under such agreement.
It is not the theory of the act and of this suit that plaintiff and the defendant ever made an agreement or contemplated an agreement whereby the defendant would reimburse plaintiff for its expenditures in the extension of its water supply system. The theory is rather that the parties made an agreement whereby plaintiff would enlarge its water system sufficiently for the defendant to have a dependable supply of water, and the defendant would take what water it needed for its Raritan Arsenal and Colonia Base Hospital No. 2 from plaintiff and pay plaintiff for it; that plaintiff enlarged its water system but the defendant did not take any water; and that as a result of this conduct of plaintiff and the defendant, an equity arose in plaintiff to be reimbursed for its expenditures.
Plaintiff contends that Congress intended, by the special act, to determine that such an agreement had been made and that plaintiff had an equitable right to be reimbursed, leaving to the court only the question of determining how much plaintiff had expended pursuant to the Congressionally found agreement.
We think that is not the meaning of the special act. It placed upon us the duty of rendering judgment upon plain *456 tiff’s claim “upon its merits and according to the equities of the case.” This language does not suggest the mere task of determining the amount of plaintiff’s expenditures. During the consideration of the bill on the floor of the Senate, the member of the Senate Committee on Claims who was in charge of the bill said its purpose was not merely to confer upon this court the authority “to determine whether or not there was any damage, and if so, how much”, but to determine “whether or not the Government should pay it.” We undertake, therefore, to determine whether a contract formal or informal was made, and if so whether the facts are such as to create in plaintiff an equitable right to recover its expenditures.
Plaintiff City was, early in 1917, giving thought to the expansion of its water supply. In that year its Board of Water Commissioners employed Mr. George Johnson, a water-supply engineer, to make a study and report, with recommendations. Mr. Johnson made a series of monthly reports beginning in September 1917. His first report stated that there was a dangerous inadequacy of supply and that the only expedient immediate remedy for it was to construct an intake and pumping station on city property near Old Bridge to take water from South River and deliver it to the City’s then present pumping station and wells at Runyan. Some of this water was to be filtered through the sand filters at Runyan and thus go into the City’s supply, and the rest was to be placed on the ground at the wells to filter into the ground water supply, thus raising the level in the wells and relieving the pumps of a part of their lift. Mr. Johnson recommended that the new equipment and pipe line be selected with a view to incorporating it in permanent works to be built later.
At the meeting at which this report and recommendation was submitted, the Board instructed the Water Superintendent and City Attorney to obtain permission from- the proper State Board to take water from South River. Before the end of the year the immediate addition recommended by Johnson in September was constructed, at a cost of $35,000.-
In Johnson’s report of November 21,1917, he said that the City was endeavoring to purchase 70 acres of land on the east *457 bank of South Eiver about 6,000 feet due west of Eunyan Station where the City’s then wells and pumping station were; that some ten or twelve wells could be sunk on that land, and could be counted on for some four million gallons per day. He said, “ * * * the first step, ground storage wells at Old Bridge, should be carried out at once to meet immediate needs.” The 70-acre tract was at Old Bridge. In his report of January 11,1918, he outlined a long-range development which would provide an ultimate daily supply of 47 million gallons, which he estimated to be sufficient for 25 to 50 years, and again urged immediate action on the new well project at Old Bridge to provide immediately an increased daily supply of four million gallons. He said that at the then present rate of increase in water consumption that additional supply would suffice for not more than four years. He pointed out that the cost of the Old Bridge project would be low and construction could be completed in a few months.
In the early months of 1918 the City acquired some and took the necessary steps toward acquiring the rest of the 70 acres at Old Bridge. Johnson made further reports, and in July submitted a proposed contract, drawings, specifications, and instructions to bidders for a $900,000 distributing reservoir, to hold a reserve supply of water for fire and breakdown emergencies, and other purposes.
In August 1918, an application was made to the Capital Issues Committee of the United States Government for permission to issue bonds for constructing the reservoir, but that committee, in September, disapproved the application.
Shortly before August 6, someone from the defendant’s Earitan Arsenal, which was located near plaintiff City, must have inquired of plaintiff as to securing from plaintiff a water supply for the arsenal, as the minutes of plaintiff’s Board of Water Commissioners for August 6 contains this minute: “Motion made and carried that the Superintendent communicate with the Government Office at Camp Earitan that this Board will furnish the necessary water as requested at meter rates.”
On about September 16, 1918, Mr. Nicholas S. Hill, consulting engineer, was authorized by Brigadier General E. C. Marshall, Jr., United States Army, to initiate and conduct *458 negotiations with plaintiff for supplying water to the defendant’s Raritan Arsenal and Colonia Base Hospital No. 2. At the meeting of the Board of Water Commissioners on September 18, a letter from Hill enclosing a proposed agreement among the defendant, the plaintiff, and the Middlesex Water Company, which had a pipe line running from the defendant’s property toward plaintiff City, was read and referred to the Committee of the Whole. At this same meeting of the Board, the following action was taken:
Motion was regularly made and carried that Superintendent be instructed to prepare plans and specifications for the development of ground water supply in the South River Drainage Area as recommended by Geo. A. Johnson, Consulting Engineer, as the first step in the progressive development of additional water supply for the City of Perth Amboy. Furthermore, that the Clerk be instructed to advertise for bids for said work to be received October 3rd, 8:30 p. m. 1918.
It is evident that the plans and specifications must have been under preparation for a considerable time before and practically complete when this action was taken, because the invitation was advertised in time for the bids to be in and opened on October 2. On October 9 contracts were let for the pipe and engines for the new project.
In the meantime, at Board meetings on September 20, 25, and 30, consideration of Hill’s proposal was had. At the last of these an agreement submitted by Hill eliminating the Middlesex Water Company from the proposed contract was approved, execept as to the rates to be paid, and as to the insertion of a strike clause. During the month of October there were exchanges between Hill and the Board as to the rates, with the Board holding out for $90 per million gallons, and Hill insisting on $70 and pointedly suggesting that the defendant would take over the plant if its offer was not accepted.
On November 8,1918, the Board empowered plaintiff’s officers to sign the proposed contract then submitted by Hill, when it had been approved by the City Attorney. The Water Superintendent, Mason, made a marginal alteration changing the head of water pressure at which plaintiff agreed to *459 deliver the water, from 170 feet as written, to 150 feet. It is not proved whether this alteration was made before or after the paper was signed by plaintiff’s officials. Three copies were signed and returned to Hill, who, on November 18, transmitted them to General Marshall, calling attention to the alteration. Neither General Marshall nor anyone else ever signed them for the defendant.
Plaintiff’s Board of Water Commissioners, on December 4, 1918, let contracts for the fill and embankments and the construction of the pumphouse building at Old Bridge. The drilling of the six wells which were drilled on the Old Bridge project was begun in March or April 1919, and completed some three months later.
It would have been necessary for the defendant in order to have access to plaintiff’s supply of water to have built a pipe line connecting with the supply mains of the City. This work was never begun.
The proposed agreement in question contained this sentence : “The United States reserves the right to terminate this contract at any time * * * by giving thirty days’ notice in writing.” No written notice was ever given. On March 18,1919, plaintiff notified the defendant’s officers that it was ready to deliver water under the contract. This was before the installation of the facilities which are the subject of this suit had been completed. By April 14, 1919, plaintiff had been advised by the defendant’s officers at Bonhamton that the defendant did not “require” the plaintiff’s supply of water. A letter from plaintiff to Hill inquiring about this information brought no response. Plaintiff laid the pipe and installed the pumps and equipment on the new project, beginning in January 1919, and not finally completing the job until August 1920.
We are of the opinion that no agreement, formal or informal, was ever arrived at between plaintiff and the defendant. The defendant did submit through Hill an agreement which it was willing to make. Plaintiff’s agent either before or after execution by its officers, made a material change in the writing, to plaintiff’s benefit. The consequence was that the writing, as it was returned by plaintiff to Hill, did not embody the agreement which the defendant had been willing to *460 make. Treating the changed writing as a counter offer, as plaintiff urges, would not, where there had been no previous course of dealing in that manner, justify an assumption that the counter offeree agreed to its terms by silence.
Whether the special-act requires, as a condition of a recovery by plaintiff, that we find an agreement between the parties, we do not decide. We think that the circumstances do not, in any event, give rise to an equity in plaintiff to be reimbursed for the expenditures here in question. Plaintiff did not undertake the project here under consideration in reliance upon the negotiations with the defendant. Its Water Board was planning for immediate needed increase of supply and for long range increase before the defendant initiated negotiations. Its consulting engineer, Johnson, laid out a program for it which it seems to have ultimately completed, largely as Johnson planned it. The largest and most expensive part of this work was done after plaintiff knew that the defendant Was not to be a user of its water. In Johnson’s program first was an immediate addition of river water to plaintiff’s supply. This was done in 1917. Next was an addition of ground water, the project here under consideration, to take care of needs for not more than four years. Johnson strongly urged it in 1917, and early in 1918, months before the defendant requested water. By September 18, 1918, the day on which the first communication from the defendant’s agent Hill concerning the defendant’s receiving water from plaintiff was read and referred to a committee, plaintiff’s plans had so far developed, in accordance with Johnson’s urgent recommendations, that the invitation could be advertised and the bids be received and opened within 14 days thereafter. This was done “as recommended by Geo. A. Johnson, Consulting Engineer, as the first step in the progressive development of additional water supply for the City of Perth Amboy.” We are satisfied that this action was planned and would have been executed if the defendant had never made its request. It resulted rather from plaintiff’s expectations as to a continued general increase in demand for water, and its desire to have an adequate supply to meet that need. The fact that it had these plans made it willing to un *461 dertake to supply the defendant, when the defendant made its request, if it could arrive at a satisfactory agreement as to rates. Plaintiff not only made the plans here in question before the defendant entered the scene, but it carried them out, to a considerable extent, after the defendant left the scene. Most of the drilling of the wells, most of the installation of the equipment, had not been contracted for but was done by labor hired by plaintiff for that purpose after it knew that the defendant was not going to use its water.
Not only did plaintiff have its plans to make the improvement here under consideration matured before the defendant came upon the scene, but it carried out those plans without substantial change after the defendant left the scene. The occurrence of the Armistice; the fact that plaintiff did not receive a copy executed by the defendant, or any copy, of the contract; the fact that the defendant made no move toward doing the extensive work necessary on its part to receive its water supply from the plaintiff; this combination of circumstances would have caused plaintiff to hesitate and inquire if it had been proceeding in reliance upon the contract. But it was, as the minutes of its Water Board said, doing what it did “as the first step in the progressive development of additional water supply for the City of Perth Amboy.” And this progressive development related to the Board’s expectations as to the general growth of the City, rather than to the needs of the defendant.
Plaintiff in 1920 went ahead and built its $1,200,000 reservoir, long after it knew that the defendant would not take water from it. In the further development of plaintiff’s long-range plan, with a falling off in the demand for water, it seems to have become uneconomical or somehow inexpedient to use the facilities here under consideration. But we conclude that no equity, cognizable by a court, thereby arose in plaintiff to have the defendant reimburse it for their cost.
The petition will be dismissed. It is so ordered.
JoNes, Judge; Littleton, Judge; and Whaley, Chief Justice, concur.
Whitaker, Judge, took no part in the decision of this case.